IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

JOSE JULIAN CRUZ BERRIOS,

Petitioner,

v.

LESTY BORRERO, ET AL.

Respondents.

CIV. NO.: 14-1232 (ADC/SCC)

## REPORT AND RECOMMENDATION

After a bench trial held on August 27, 2001, at the Commonwealth of Puerto Rico's Court of First Instance, Aibonito Part, Petitioner José Julián Cruz Berrios was found guilty and sentenced to life imprisonment. He has been incarcerated since. This is his third attempt at seeking a habeas corpus in federal court.

Cruz-Berrios relies on 28 U.S.C. § 2254(d), which allows a person in custody pursuant to a state judgment to seek federal habeas relief if the state criminal case either resulted in a decision that is contrary to clearly established federal law or; resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding.

The Presiding Judge referred the petition (Docket No. 2), as well as respondents' Motion for Summary Judgment (Docket No. 139), to the undersigned for a Report and Recommendation.[1] The evidentiary hearing lasted three days. Seven witnesses testified, and post-trial briefs were filed.

Having carefully examined all the evidence, the Court recommends that the Presiding Judge grant Cruz-Berrios' request for habeas relief and deny respondents' Motion for Summary Judgment.

## I.  PROCEDURAL BACKGROUND[2]

The procedural history of this case spans several years. In the spirit of brevity, we will only recount the procedural details that are essential for context.

### A.  State Procedural Background

On or around January of 2000, Cruz-Berrios was accused by the Commonwealth of Puerto Rico of robbery and violations of Puerto Rico's Weapons Law for events that

---

[1] The referral orders are found at Docket Nos. 86 and 145, respectively.
[2] The Court has pieced together this procedural background from the documents on record and the witnesses' testimonies.

occurred on August 26, 1999. After a bench trial, he was found guilty and sentenced to life in prison on November 8, 2001.

Petitioner appealed his conviction to the Puerto Rico Court of Appeals ("PRCA") which affirmed the Court of First Instance's determination on September 30, 2002 (*see* Case No. KLAN0101206). *See* Docket No. 22-1. Shortly thereafter, on December 13, 2002, the Puerto Rico Supreme Court ("PRSC") denied certiorari. *See* Docket No. 22-1.

Cruz-Berrios filed a total of four motions for new trial under Rule 192.1 of the Puerto Rico Code of Criminal Procedure, 34 L.P.R.A. Ap. II, R. 192.1. The first of such motions was filed on December 12, 2003. It was denied, and then appealed to the PRCA and the PRSC which denied the writ of certiorari.  His second motion for new trial was filed on July 31, 2006. Cruz-Berrios alleged he had discovered new evidence and requested a court-appointed attorney. This motion was also denied and appealed. Petitioner's third motion for new trial, based on ineffective assistance of counsel, was denied on October 9, 2006.

On October 29, 2007, Cruz-Berrios was interviewed by the Special Affairs and Remedies Post Sentence Division of the Society for Legal Aid ("SLA"), which initiated an investigation of his case. To avoid duplicity, the SLA closed the investigation when petitioner filed an action in federal

court. After the federal case was dismissed, petitioner obtained the exculpatory evidence from the SLA.

With these new documents, petitioner submitted his fourth and final motion for new trial on November 9, 2010. An evidentiary hearing was held on June 2011. The Court of First Instance once again denied his request for new trial. Cruz-Berrios moved for reconsideration and, on December 5, 2011, the motion was denied. Cruz-Berrios filed an appeal, which was also denied. On January 26, 2004, he filed a writ of certiorari before the PRSC.

On March 23, 2004, Cruz-Berrios filed a petition for habeas corpus relief at the PRCA, which was denied on September 30, 2004. *See* Docket No. 22-1. He subsequently filed a certiorari petition before the PRSC seeking review of his first motion for post-conviction relief. The PRSC denied the petition on February 18, 2005.

**B.  Federal Procedural Background**

Cruz-Berrios filed his first habeas corpus petition pursuant to 28 U.S.C. § 2254 on September 12, 2003. *See* Civil No. 03-1995. Based on a report and recommendation from a Magistrate Judge, Judge Juan M. Pérez-Giménez dismissed the petition for failure to exhaust state court remedies. *See* Docket Nos. 139-5, 139-6 and 139-7.

Petitioner again moved for habeas relief on June 30, 2008. *See* Civil No. 08-1693. After finding the petition filed was a mixed one, containing both exhausted and unexhausted claims, the court granted petitioner until April 28, 2010, to inform whether he would dismiss the unexhausted claims and continue only with the sole exhausted claim, or would instead withdraw the entire petition. *See* Docket No. 42 of Civil No. 08-1693. Cruz-Berrios failed to comply. Accordingly, and pursuant to the "total exhaustion rule," *see Rose v. Lundy*, 455 U.S. 509, 520-22, 102 S.Ct. 1198 (1982), the Judge ordered that the entire § 2254 petition be dismissed without prejudice on April 30, 2010. *See* Docket No. 139-13, and Docket No. 44 of Civil No. 08-1693.

The third and final § 2254 petition was filed on March 19, 2014. *See* Docket No. 2. Petitioner claims (1) violations of his Fifth and Fourteenth Amendment due process rights as a result of prosecutorial misconduct; *Brady* [3] violations, and general gross misconduct leading to nondisclosure and denial of pre-trial and post-conviction exculpatory evidence; and (2) violations of his Sixth Amendment right for ineffective assistance of counsel during his criminal case.

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

Respondents filed a Motion to Dismiss which was denied on September 9, 2015. They subsequently answered the complaint. *See* Docket Nos. 40 and 42.

## II.    FACTUAL FINDINGS

The Court's findings of fact are based on documents on the record and on the testimonies and evidence presented at the hearing.

On the night of August 26, 1999, a robbery took place at the residence of Angel Antonio Ortiz-Burgos[4] and his wife, Marta Meléndez, in Helechal Ward, Barranquitas, Puerto Rico. According to the statement that Ortiz-Burgos gave to Puerto Rico Police Department ("PRPD") case agent José Vega López, on the night of the events, he was with his wife at his neighbor's house. A white vehicle with tinted windows and a government license plate drove by the front of their home several times. Ortiz-Burgos and his wife went back to the house because their young daughter was there with a friend. As they approached, they saw the white vehicle near the gate. Their son, Anthony, had arrived at the house a few minutes before. Anthony was accompanied by the brother of

---

[4] Throughout the hearing, many witnesses referred to Ortiz-Burgos as "Toño."

the girl that was in the house with Ortiz-Burgos' daughter. The visitors left the house.

Thinking that the white vehicle was a police car because it had government license plates, Ortiz-Burgos asked his son whether he had done anything wrong. At that moment, a man got out from the back left-seat, grabbed Ortiz-Burgos' wife and announced the robbery. The assailants took the family inside the house. Both men had their faces covered. A third participant was driving the getaway car. One of the assailants was wearing a pantyhose as a mask, but from his weight, height, physical characteristics, and mostly his voice, Ortiz-Burgos said he recognized him.

When he opened the refrigerator door, Ortiz-Burgos allegedly saw the shadow of his face through the pantyhose with help from the refrigerator's light. Ortiz-Burgos identified the perpetrator as Cruz-Berrios, whom he knew because they were both from the town of Barranquitas. Ortiz-Burgos testified that he owned two businesses and Cruz-Berrios was a customer. The other two assailants were never identified. The car with the government license plates was not found. No fingerprints were recovered.

The police eventually charged Cruz-Berrios with robbery and weapons violations. Cruz-Berrios waived his right to a jury trial. During the bench trial, the prosecution called

several witnesses to the stand including Ortiz-Burgos and his wife, agent Vega, and an inmate named Héctor Rivera-Mateo, who had a one-time interaction with Cruz-Berrios while in prison.

Rivera-Mateo, who knew both Cruz-Berrios and the victim, testified that while they were both incarcerated, Cruz-Berrios had admitted that he committed the robbery at Ortiz-Burgos' home. Nevertheless, in a statement that Rivera-Mateo gave later during an investigation conducted by the Office of the Inspector General ("OIG") of the Puerto Rico Department of Justice, he stated that he talked to Cruz-Berrios once at Annex 246 in Ponce. According to Rivera-Mateo, Cruz-Berrios told him that "he was there (in prison) because he was being charged with the robbery of Toño (Ortiz-Burgos)." Docket No. 56-7 at pg. 12. At no point did Rivera-Mateo say that Cruz-Berrios admitted to participating in the crime. *Id*. Moreover, Oliveras asked Rivera-Mateo whether Cruz-Berrios gave him details about the crime and Rivera-Mateo said that he did not. *Id*. at pg. 13.[5]

---

[5] "Q: In that conversation, José Julián told you how the facts occurred, how it was done and what happened?

A: Nothing, no details. He did not tell me anything, only that he was there for the case of robbery of Toño."

During his testimony at trial, Ortiz-Burgos identified Cruz-Berrios as the assailant. His wife did not. No physical evidence or fingerprints were recovered. Cruz-Berrios was found guilty by the Court and, because he stipulated his criminal history, was sentenced to life imprisonment. He has claimed his innocence ever since.

At the hearing in this case, which took place on November 29 and 30, and December 4, 2018, the first witness to testify was Gamalier Oliveras Alvarez. Oliveras testified that back in 2007 he worked as a Special Prosecutor at the OIG, an investigative arm of the Department of Internal Affairs.

In 2009, the Office of the Puerto Rico Secretary of Justice referred a complaint to the OIG for investigation. Cruz-Berrios was the claimant. He complained that the prosecutor in his case, Francisco Sánchez-Rodríguez, had behaved improperly. Oliveras lucidly recalled details about the investigation and his testimony was precise and reliable.

For the remainder of 2009 and most of 2010, OIG personnel reviewed documents; took the testimony of several witnesses (including witnesses that testified at the criminal proceedings against Cruz-Berrios, and police officers who worked on the case); interviewed the prosecutor; and gathered evidence. Oliveras' team even investigated the penal

institution in which Cruz-Berrios had been imprisoned and where the alleged conversation with Rivera-Mateo took place.

The OIG interviewed PRDP agents Angel Sánchez Rivera and Vega. Both had been involved in the investigation of the robbery at the Ortiz-Burgos residence. The OIG also interviewed two of Cruz-Berrios' former lawyers, attorneys Antonio Ortiz Rodríguez and Julio Eduardo Torres Ortiz. The OIG took several sworn statements, including those of Ortiz-Burgos, Rivera-Mateo, PRPD agents Sánchez and Vega, and prosecutor Sánchez-Rodríguez.

Oliveras particularly remembered the Sánchez interview because Oliveras had seen a report made by Sánchez stating that he had been the first police officer to interview the victims at the scene of the crime. That struck Oliveras as odd because during Cruz-Berrios' criminal trial, agent Vega had testified that he was the first agent at the scene.

During an interview with Juan Santos, a member of the OIG, agent Sánchez corroborated that he was the first one to interview the victims and that he prepared and signed the incident report. When asked why he had been assigned to canvas the scene when he was not in the Robbery Division, Sánchez responded that he was the only police officer available at the time.

After taking agent Sánchez' statement, the OIG interviewed agent Vega, who stated that he had gone to Ortiz-Burgos' home the day after the incident and interviewed him and the other victims of the robbery. During the interview with agent Vega, Ortiz-Burgos identified Cruz-Berrios as the perpetrator. When Oliveras confronted agent Vega with agent Sánchez' testimony, he recanted and admitted that although he had declared that he had been at the house on the 27th, he wasn't actually there. But he "gave full credit to what his colleague, Sánchez, said." ("Yo doy por bueno lo que dijo mi compañero Sánchez").

It must be noted that during Cruz-Berrios' trial, Vega testified that he was the first responder at the scene, but failed to mention that Cruz-Berrios had not been identified during the initial interview with the victims.

Oliveras also asked Vega whether he had investigated the allegations of inmate Rivera-Mateo regarding Cruz-Berrios' admissions to him. Vega admitted that he had not corroborated them.[6]

As part of its inquiry, the OIG also obtained Ortiz-Burgos' statement. Oliveras testified that, during their meeting, Ortiz

---

[6] During the hearing, it surfaced that Rivera-Mateo was in the same prison as Cruz-Berrios, but not in the same unit, making it less likely that they would have the opportunity for communication.

Burgos was cordial, seemed lucid, and expressed that his testimony was not coerced in any way.  Ortiz-Burgos told Oliveras that he remembered relaying his doubts about Cruz-Berrios' participation in the home invasion to prosecutor Sánchez-Rodríguez. He also told the prosecutor that he had no interest in continuing the case.

Specifically, Ortiz-Burgos said: "Yes, I told him [that he was not sure whether Cruz-Berrios had taken part in the home invasion and that he had no interest in pursuing the case] on the second floor of the Aibonito Courthouse, and I told him because that was the truth and I still think so." *See* Docket No. 56-7 at pg. 3 (emphasis supplied). Oliveras followed up with these questions:

Q: What answer did Prosecutor Rodríguez told [sic]?

A: That it was not my problem, that I had nothing further to do with that, that I no longer could decide, that now it was a state matter.

…

Q: What was the reaction, if any, of counselor Ortiz Rodríguez?

> A: None, he did nothing. I always thought that if counselor Toñito [7] had said something, the process against Papo[8] would have been stopped.

*Id*. at pgs. 3-4.

As the OIG's investigation ended, Oliveras concluded that there was exculpatory evidence that could benefit Cruz-Berrios. He also determined that in light of the testimonies and documentary evidence, the prosecution had engaged in improper conduct. Specifically, Oliveras identified several missteps in the investigation and in the criminal proceedings.

Accordingly, Oliveras requested a meeting with the Puerto Rico Secretary of Justice to turn over the evidence he had gathered. A meeting was convened and attended by Puerto Rico District Attorney Obdulio Meléndez, Sub-Secretary Anthony Murray, and other high-ranking officials of the Puerto Rico Department of Justice. The officials reviewed the evidence and Murray told Oliveras that "he had the green light" to release the exculpatory evidence and his findings.

On October 27, 2010, and with the Solicitor General's concurrence, Oliveras sent a letter to the SLA, which at the time was representing Cruz-Berrios, disclosing his findings

---

[7] Refers to prosecutor Sánchez-Rodríguez.
[8] "Papo" was Cruz-Berrios' nickname.

and the potential exculpatory evidence. *See* Exhibit 1 of the habeas hearing, Docket No. 156-1. Oliveras also considered recommending disciplinary action against prosecutor Sánchez-Rodríguez but did not include it in the letter.

Eventually, a new Inspector General was appointed. The new Inspector, Héctor López, requested that Oliveras surrender the case file. Around that time, Oliveras was summoned to testify at the Aibonito Court of First Instance for a hearing on a motion for new trial that Cruz-Berrios had filed. He stated that his testimony at the hearing was very similar to what he testified in this case.

From that point on, Oliveras was no longer involved in the case until he received a call from the Aibonito Court telling him that a ruling had been issued. The court found that a new trial was not warranted but made findings regarding the improper conduct of the prosecutor.

Oliveras never submitted an official final report nor did he recommend a sanction to the prosecutor. He no longer has access to the file because he surrendered it to the OIG. He did not know until he testified at the habeas hearing that someone at the OIG concluded that there was not enough evidence for the matter to go forward.

The second witness to testify was attorney Julio Eduardo Torres Ortiz, head of Aibonito SLA at the time of the events,

and Cruz-Berrios' counsel from the preliminary hearing stage through the filing of a motion to suppress.

Torres-Ortiz testified that many inconsistencies on Cruz-Berrios' case emerged at the preliminary hearing, including incertitude about the victim's identification of Cruz-Berrios as the assailant. On that issue, the most notable portion of Torres-Ortiz' testimony was his account of an incident involving himself and Ortiz-Burgos after Torres-Ortiz had ceased to be Cruz-Berrios' attorney. Torres-Ortiz ran into Ortiz-Burgos at the Aibonito courthouse. Ortiz-Burgos complained that the police was framing his son for a crime he did not commit to which Torres-Ortiz replied: "that's the same thing you are doing" to Cruz-Berrios. Ortiz-Burgos then responded that "he wasn't even sure that it was him," referring to his previous identification of Cruz-Berrios as the perpetrator.

Torres-Ortiz immediately related the incident to Cruz-Berrios' attorney, Ortiz-Rodríguez, and to prosecutor Sánchez-Rodríguez. They "did not say anything in response." Docket No. 56-3 at pg. 43.[9]

---

[9] Torres-Ortiz was summoned as a defense witness during Cruz-Berrios' trial. He also testified at the evidentiary hearing on the first motion for new trial. At the hearing on the latter, Ortiz-Burgos denied the incident between him and Torres-Ortiz, but the Court of First Instance did not

Petitioner's next witness was PRPD agent Sánchez, a Sergeant at the Criminal Investigations Unit ("CIC") in Aibonito. Back in August of 1999, Sánchez was an agent in the Property Division of the CIC in Coamo. On August 27, 1999, a day after the Ortiz-Burgos robbery, he was called to the victims' residence. The only other officer at the scene was Nelson Mateo, a technician. Agent Sánchez interviewed Ortiz-Burgos, his wife, and his son, and prepared a statistical report which was then referred to the Robbery Division. Statistical Reports are a type of criminal complaint ("querella") and describe facts, victims, stolen property and possible suspects.

Ortiz-Burgos provided a description of the two assailants. One was around 6 feet tall and had a pantyhose over his face. The second was wearing short jeans, a polo-type t-shirt and a mask. Sánchez included the description of the perpetrators in his report. To the best of his knowledge, no fingerprints were lifted from the scene.

---

believe him. In fact, in the Resolution denying Cruz-Berrios' motion for new trial, the Court found that "the witness [Mr. Ortiz-Burgos] was lying" at trial when he denied telling Torres-Ortiz that he harbored doubts about whether Cruz-Berrios had in fact committed the robbery. *See* Docket No. 56-8 at pg. 46.

After his initial interview, Sánchez did not continue as the case agent and the investigation was assigned to agent Vega. Sánchez did not testify at Cruz-Berrios' trial but was a witness at the evidentiary hearing on the first motion for new trial filed by Cruz-Berrios after his conviction.

Sánchez remembered that he was interviewed by the OIG but does not remember the exact content of the interview. He could not recall if he participated in any meetings with the prosecutor.

The testimony of agent Sánchez was followed by that of Agent Vega. Vega has been an agent in the PRPD Aibonito Division for 28 years. At the time of the events, he was assigned to the Robbery Division. He was the lead agent in charge of investigating the robbery where Cruz-Berrios was a suspect.

As part of the investigation, Vega interviewed Ortiz-Burgos and his wife.  The interview took place on August 28, 1999, a day after Sánchez had interviewed the victims. Vega nonetheless testified at trial that he was the first agent who met with the victims after the incident. He relayed that version to Oliveras as part of the OIG investigation. When confronted at the habeas corpus hearing with the inconsistency between his version and Sánchez', he stated that he made a mistake. He admitted that he realized the

mistake when he was interviewed by the OIG and was shown Sánchez' report. He allegedly explained to Oliveras that he had been confused about the date of the interview. At the habeas hearing, he restated that it was an honest mistake.

Vega took notes, but did not write a report, of his interview with Ortiz-Burgos.[10] He admitted that he drafted a report after the charges had been filed. Because there was no report, prosecutor Sánchez-Rodríguez allegedly used his handwritten notes to file charges.

Sánchez-Rodríguez testified next. He had a long career as a state prosecutor and purportedly prosecuted thousands of cases. At the time of the hearing, he was no longer a prosecutor. [11] Throughout his testimony he expressed complete disregard and outright repudiation of Oliveras' investigation and conclusions.

Sánchez-Rodríguez' participation in Cruz-Berríos' case began at the preliminary hearing stage. Sánchez-Rodríguez explained that in the Puerto Rico criminal system there is a prosecutor assigned to investigate the case, and another

---

[10] The only document that Vega prepared at the time was the "Informe de Denuncia y Arresto" which does not contain a summary of the interview with the victims.

[11] The Court notes that Sánchez-Rodríguez became very defensive when questioned about his termination and rebuffed any implication that his dismissal was related to this case.

assigned to appear at the preliminary hearing. The prosecutor who was involved in the investigatory phase was José Miguel Ramírez Legrand. He did not testify at the habeas hearing.

Going back to the day of the preliminary hearing in Cruz-Berrios' case, Sánchez-Rodríguez remembered that he interviewed the victims and agent Vega. During his interview, Ortiz-Burgos identified Cruz-Berrios as the assailant. Sánchez-Rodríguez doesn't know whether the other two alleged participants in the robbery were apprehended or charged and adduced that "it is the police that has to investigate, prosecutors are not involved in that part."

When asked whether he interviewed agent Sánchez, he replied that "he didn't have to" because he only relies on the statements of the agent from the specialized unit assigned to the case. He still believes that Sánchez' participation is irrelevant even though he was the first officer to come in contact with the victims after the incident. According to Sánchez-Rodríguez, he found out during the criminal proceedings that Sánchez had been first on the scene and attributes Vega's misrepresentation to "human error."

Regarding the exculpatory evidence in the OIG's investigation, Sánchez-Rodríguez testified that he did not find the evidence to be compelling. He admitted that he learned about the victim recanting his identification but, in his

opinion, "that happens almost daily" and "recanting of a witness is not a motive for new trial." Sánchez-Rodríguez further explained that the issues raised in the OIG's report had been adjudicated by the court on several instances and that Oliveras had a bias against him, so he gives little credibility to his findings.[12]

Cruz-Berrios filed several complaints for prosecutorial misconduct against Sánchez-Rodríguez. In that context, the state court also made some findings regarding Sánchez-Rodríguez' conduct. For one, in its Resolution of August 1, 2011, the Court of First Instance stated that Sánchez-Rodríguez should have informed the court about Ortiz-Burgos' doubts regarding the identity of the perpetrator. *See* Docket No. 56-8 at pg. 46. During his testimony at the habeas hearing, Sánchez-Rodríguez justified this omission by saying that he was not present when the victim recanted and thus did not feel that he had to tell the court.

The last administrative complaint against Sánchez-Rodríguez was dismissed but he was not informed of the outcome.

---

[12] Sánchez-Rodríguez attributed the bias to political reasons but could not explain Oliveras' purported ill motivations. Sánchez-Rodríguez expressed discontent over what he perceived as a scrutiny of his professional actions by someone (Oliveras) with "little criminal experience."

The sixth witness to testify at the habeas hearing was attorney Antonio Ortiz-Rodríguez. He was Cruz-Berrios' attorney during the suppression hearing held on the issue of identification and during his criminal trial in Aibonito.

Ortiz-Rodríguez' recollection of the details of the case was scant at best. For example, he did not remember the testimony of Ortiz-Burgos' wife (who coincidentally did not identify Cruz-Berrios as the perpetrator); could not recall whether the judgment had been appealed; and had no memory of the evidence that was presented at trial.

Ortiz-Rodríguez, however, remembered that he stipulated with the prosecution that Cruz-Berrios was a habitual criminal offender. Under Puerto Rico's so-called "three strikes rule," individuals that fall under that criminal history category are sentenced to life imprisonment. Even so, Ortiz-Rodríguez emphasized that he did not press on the matter because the prosecution was not open to negotiations and that he tried to approach the prosecutor to discuss the issue, but "being [Cruz-Berrios] the person that he was…a habitual delinquent," the prosecutor was not receptive. In fact, Ortiz-Rodríguez mentioned throughout his testimony that the

prosecution had a "heightened interest" in the Cruz-Berrios case.[13]

Ortiz-Rodríguez was questioned regarding the decision to waive Cruz-Berrios' right to a trial by jury. The waiver seems particularly vexing considering the procedural history of the case. In its review of the trial court's suppression of the key piece of evidence against the defendant: Ortiz-Burgos' eyewitness identification, the Court of Appeals ruled that the issue was one "for the jury, not the Court, to determine." When asked at the habeas hearing about the reasons for seeking a bench trial, Ortiz-Rodríguez responded that Cruz-Berrios and the Judge knew each other.

But perhaps the most crucial part of Ortiz-Rodríguez' testimony was his revelation of a conversation between himself and Ortiz-Burgos, where the latter said that he had no interest in continuing the criminal process against Cruz-Berrios.[14] Ortiz-Rodríguez told Ortiz-Burgos to go to the prosecutor with the information. In Ortiz-Rodríguez' opinion, "the prudent thing was to refer this to the appropriate person," meaning, the prosecutor. Ortiz-Rodríguez does not

---

[13] The Court inquired as to the reasons for the heightened interest of the government in Cruz-Berrios' case, but no definite response was given.

[14] Ortiz-Rodríguez does not remember the exact date in which the conversation took place, but to the best of his recollection, it happened before trial.

remember if he relayed this information to the OIG when he was interviewed, or to the SLA. In his own words, "he could not do more than what he already did" for Cruz-Berrios.

The only witness for respondents in the habeas hearing was Carlos González-Román. González-Román succeeded Oliveras as Inspector General. He explained that there were two referrals to the OIG regarding the Cruz-Berrios case. The one that he worked on was initiated by the SLA. The SLA's petition referred to a previous investigation, (the one conducted by Oliveras), because the SLA had learned that prosecutor Sánchez-Rodríguez was the subject of that inquiry.

González-Román reviewed the documents and Oliveras' notes since there was no official report. He did not interview witnesses and did not gather additional evidence. Within Oliveras' documents, he could not find a conclusion or recommendations regarding Sánchez-Rodríguez' conduct as a prosecutor.

He also reviewed the Final Report of an investigation focused on prosecutor Sánchez-Rodríguez. [15] It contained allegations of anomalies in the Cruz-Berrios' case. The

---

[15] That Final Report was signed by Héctor López and Investigator Melissa Rodríguez from the OIG.

investigation had been closed and no sanctions were recommended.

His review took several months. He prepared a report which was signed by the Inspector General at the time and submitted his recommendations to the Secretary of Justice. He concluded that the Final Report approved by the OIG was correct and well-supported. The Secretary, in turn, accepted his conclusions and signed González-Román's report.

The OIG ceased to exist in 2017 and since then, González-Román has not accessed the files.

## III.    ANALYSIS

Petitioner challenges his state conviction on the basis of prosecutorial misconduct; *Brady* violations; and ineffective assistance of counsel. Before discussing each at length, the Court must first address the jurisdictional challenge raised by respondents.

### A. Jurisdiction

The respondents argue that the Court lacks jurisdiction to hear Cruz-Berrios' third habeas corpus petition because it is an unauthorized successive petition. *See* Motion for Summary Judgment at Docket No. 139. Generally, a claim presented in a second or successive habeas corpus application under § 2254 that was presented in a prior application shall be dismissed, unless authorized by the appropriate Court of Appeals. *See* §

2244(b)(1) of the Antiterrorism and Effective Death Penalty
Act ("AEDPA"), 28 U.S.C.A. § 2244.

The determination of whether a petition is considered
"successive" is defined by its substance, not its numerical
designation. If the petition attacks a different criminal
judgement or if the **earlier petition terminated without a
judgement on the merits**, it is not considered successive. *Pratt
v. United States*, 129 F.3d 54, 60 (1st Cir. 1997)(emphasis
supplied).

Cruz-Berrios has filed two previous petitions for habeas
relief challenging his 2001 state judgment. The first petition
was filed on September 12, 2003. *See* Civ. No. 03-1995 (PG);
Docket No. 139 at Exhibits 5, 7, Docket Nos. 139-5 and 139-7.
The Court adopted a Report and Recommendation from the
Magistrate Judge recommending that the case be dismissed
for failure to exhaust state court remedies. *See* Docket No. 13
of Civ. No. 03-1995 (PG). Although the judgment was entered
with prejudice, the content of the order reveals that the
petition was not adjudicated on the merits.

The second petition was filed on June 30, 2008, and
dismissed without prejudice by Judge Carmen Consuelo
Cerezo. *See* Civ. No. 08-1693 (CCC); Docket No. 139 at Exhibit
13. In her Opinion, the Judge addressed the exact issue
regarding successive petitions that is presently before this

Court. The Judge looked to Supreme Court precedent holding that a habeas petition dismissed on exhaustion grounds is not considered a "second or successive" petition under § 2244(b). *See* Docket No. 42 of Civ. No. 08-1693 at pg. 2.

Even though the previous case had resulted in a judgment with prejudice, the Court did not consider the matter to be adjudicated on the merits. *Id*. at pg. 2. ("We have reviewed the docket of the prior application filed by Petitioner, ...., and note that the Court dismissed it on June 8, 2004 precisely due to Petitioner's failure to exhaust all remedies available to him in the courts of Puerto Rico. Thus, the present Petition may not be dismissed on res judicata grounds...").

After considering the procedural tract of the case at the state level, the Court deemed the habeas petition as a "mixed" one, containing both exhausted and unexhausted claims. *Id*. at pg. 4. On those grounds, the Court dismissed the action without prejudice and expressed:

> If he [Petitioner] opts for the second option--withdrawing the entire Petition--Petitioner's entire habeas application will be dismissed, without prejudice, and he may return to this Court with a fully exhausted petition after exhausting the remaining claims which will not be considered to be "second or successive" under the statute.

Respondents did not seek reconsideration or appeal the Judgment.

Cruz-Berrios headed the Court's ruling and returned to Federal Court after exhausting administrative remedies. Respondents, however, vehemently argue that petitioner had to request permission from the First Circuit prior to filing for habeas relief.

We disagree. Following Judge Cerezo's rationale, we find that the earlier petitions were terminated without a determination on the merits. As such, the current petition is not a "second" or "successive" petition requiring prior authorization from the Court of Appeals. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000) ("[A] habeas petition which is filed after an initial petition was dismissed without adjudication on the merits for failure to exhaust state remedies is not a "second or successive" petition as that term is understood in the habeas corpus context."). Therefore, we recommend that the Presiding Judge find that this Court has jurisdiction to rule on Cruz-Berrios' § 2254 motion.

## B. Res Judicata

Respondents further argue that the doctrines of res judicata[16] and full faith and credit[17] bar Cruz-Berrios' present habeas petition because the state court already adjudicated his constitutional claims.

Cruz-Berrios counters that res judicata does not apply in habeas corpus proceedings and cites to Supreme Court precedent for that proposition. *See Sanders v. United States*, 373 U.S. 1, 8 (1963)("The inapplicability of res judicata to habeas, then, is inherent in the very role and function of the writ."); *St. Pierre v. Helmegoe*, 545 F.2d 1306, 1307 (1st Cir. 1976).

Respondents have raised the res judicata defense twice before without success. In the course of addressing Cruz-Berrios' second habeas petition, the Court held that res judicata was inapplicable because the previous habeas petitions had not been resolved on the merits. *See* Civ. No. 08-

---

[16] To prevail on his res judicata defense, the government must show: (1) the existence of a prior judgment on the merits that is final and unappealable; (2) a perfect identity of thing or cause between both actions; and (3) a perfect identity of the parties and the capacities in which they acted. Docket No. 139 at pg. 29.

[17] According to the government, the Commonwealth afforded Cruz-Berrios his day in court and pursuant to the full faith and credit statute of 28 U.S.C. §1738, this Court must give the same effect to the State Court's judgment as the issuing jurisdiction would. Docket No. 139 at pg. 28.

1693 at pg. 2. Similarly, in their Motion to Dismiss at Docket No. 17, respondents once again argued that all the requirements for res judicata were present here. In its Opinion and Order denying the Motion to Dismiss, the Court rejected their argument and held that Cruz-Berrios had presented enough arguments to survive dismissal under Fed. R. Civ. P. 12(b)(6).

Throughout the span of the three-day proceeding before this Court, respondents repeatedly stated that the issues that had been adjudicated by the state court could not be subject to review. Each time, the Court directed respondents to the language of § 2254 which unambiguously states that an applicant in state custody pursuant to the final judgment of a state court may file an application for writ of habeas corpus in federal court. When an applicant claims, (as Cruz-Berrios does here), that the state conviction was the result of an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, 28 U.S.C. § 2254(d)(2), the federal court must necessarily review issues already addressed and ruled upon by the state court. Such a statutorily-prescribed analysis is not at odds with res judicata principles as respondents purport.

For these reasons, we recommend that the Court deny summary judgment on res judicata grounds.

### C. Statute of Limitations

Respondents third and final ground for seeking summary disposition of the petition is that it is time barred by AEDPA's one-year statute of limitations.  Docket No. 139 at 17-23.

In previous submissions to the Court, respondents had conceded that the date from which the one-year AEDPA statute of limitations for filing an action in federal court began to run was March 20, 2013. *See* Motion to Clarify at Docket No. 23.[18] March 20, 2013 is the date in which the Court of First Instance notified the Resolution denying Cruz-Berrios' second motion for reconsideration. The habeas petition that is now before this Court was filed on March 19, 2014, one day shy of the cut-off date.

In their motion for summary judgment, respondents revived their statute of limitations arguments under a new

---

[18] After filing their Motion to Dismiss back in November 10, 2017, which sought dismissal on untimeliness grounds, among others, respondents notified the Court that they had inadvertently made a mistake in their computation of the statute of limitations. *See* Motion to Clarify at Docket No. 23. Respondents also stated that the date from which the one-year AEDPA statute of limitations began to run was March 20, 2013, not March 8, 2013, as they had initially claimed. *Id.* Accordingly, they moved to withdraw their request for dismissal on statute of limitations grounds. *Id.*; Opinion and Order at Docket No. 40, pg. 2 ("respondents filed a motion to withdraw its Fed.R.Civ.P. 12(b)(1) untimeliness claim on the basis that respondents incorrectly calculated when the deadline for petitioner to timely file the petition expired.")

theory. They argue that the filings in federal court did not toll the AEDPA statute of limitations and submitted a convoluted calculation to support the conclusion that Cruz-Berrios is eleven years too late. According to respondents, the correct date from which to calculate the statute of limitations is December 13, 2002, the date in which the PRSC denied Cruz-Berrios' petition for writ of *certiorari* to review the denial of his direct appeal. *See* Docket No. 139 at pgs. 11-22. Using that date as a starting point, respondents tallied the periods between each filing, in an analysis akin to computing speedy trial deadlines. Such analysis does not conform to the Supreme Court's view of AEDPA's statute of limitations as a non-jurisdictional federal statute of limitations. *Holland v. Florida*, 560 U.S. 631, 645 (2000)(citing *Day v. McDonough*, 547 U.S. 198, 205, 126 S.Ct. 1675, 164 L.Ed.2d 376 (2006))(AEDPA's statute of limitations "does not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.'").

Analyzing the intricate procedural history of this case, we conclude that Cruz-Berrios' § 2254 petition falls within AEDPA's statute of limitations because the doctrine of equitable tolling applies.

The Supreme Court has upheld a prisoner's right to pursue his constitutional claims even where a procedural bar to relief is present. The doctrines of equitable tolling and

actual innocence have allowed claims to go forward despite AEDPA's statute of limitations. *See Holland*, 560 U.S. at 645; *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013)("[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar,…, or as in this case, expiration of the statute of limitations."); *see also*, *Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238, 248 (1944)(In emphasizing the need for "flexibility," for avoiding "mechanical rules," we have followed a tradition in which courts of equity have sought to "relieve hardships which, from time to time, arise from a hard and fast adherence" to more absolute legal rules, which, if strictly applied, threaten the "evils of archaic rigidity")(internal citations omitted).

AEDPA is subject to "a rebuttable presumption" in favor of "equitable tolling." *Holland*, 560 U.S. at 645-46. The reason being that habeas corpus proceedings have been "traditionally governed" by "equitable principles." *Id*. at 646. A federal habeas prisoner invoking the doctrine must show: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing. *Id*. at 649.

The first prong is easily met. Cruz-Berrios has actively pursued relief through a myriad of ways including motions

for new trial, motions for reconsideration, habeas corpus petitions, writs of certiorari, and complaints for prosecutorial misconduct. Cruz-Berrios' diligence is particularly noteworthy given that he was not represented by counsel for much of the federal proceedings. *Pro se* litigants are held to a less stringent standard than that for lawyers. *Sissbaro v. Warden, Massachusetts State Penitentiary*, 592 F.2d 1, 2 (1st Cir. 1979).

As to the second prong, we conclude that numerous factors militated against Cruz-Berrios' accessibility to relief. For starters and as previously mentioned, Cruz-Berrios' first two federal habeas petitions were filed *pro se*. [19] From reviewing his numerous filings, the Court can ascertain that he was not advised of the AEDPA statute of limitations and of the fact that it was not tolled by federal habeas proceedings. Considering the complicated procedural gridlock in this case, which even confused respondents as they originally miscalculated the statute of limitations cut-off date, it would be unfair to expect Cruz-Berrios to possess the procedural legal acumen to time each petition.

---

[19] In Civil No. 08-1693, Counsel Rafael Anglada was appointed six months after Cruz-Berrios filed the petition. Counsel Anglada moved to withdraw, Docket No. 35, and the Court granted the request. Therefore, when Judgment was entered, Cruz-Berrios was appearing *pro se*.

Moreover, any period which might fall outside the statute of limitations period is "hardly excessive in light of the fact petitioner is pro se and incarcerated." *Wojcik v. Spencer*, 198 F. Supp. 2d 1, 3 (D. Mass. 2002).

Therefore, the Court finds that the two prongs for equitable tolling are met.

Finally, Cruz-Berrios points out that respondents waived the untimeliness argument because they withdrew it from their Motion to Dismiss at Docket No. 17. Docket No. 159. The untimeliness defense is a waivable affirmative defense. *United States v. Spector*, 55 F.3d 22, 24 (1st Cir.1995). However, we need not reach this point as we have concluded that Cruz-Berrios' action is not time-barred.

Based on these arguments, we recommend that the Presiding Judge deny summary judgment on statute of limitations grounds.

### D.  Habeas Corpus

Having addressed the grounds on which petitioner requested summary disposition, the Court now focuses on the substance of Cruz-Berrios' habeas petition. Because Cruz-Berrios is raising claims that were adjudicated on the merits in state court, we may only grant relief if he shows by clear and convincing evidence that the state court proceedings:

(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of
the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the state court proceeding.

28 U.S.C. § 2254(d); *Rashad v. Walsh*, 300 F.3d 27, 34 (1st
Cir. 2000).

As respondents point out in the post-hearing briefs, in
federal habeas corpus proceedings instituted by persons in
custody pursuant to a state judgment, "state-court
determinations of 'a factual issue' shall be presumed to be
correct," unless one of the enumerated exceptions is present.
*See* 28 U.S.C. 2254(e)(1); *Thompson v. Keohane*, 116 S.Ct. 457, 463
(1995). In this context, "factual issues" are "basic, primary, or
historical facts." *Id.* at 464 (internal citations omitted). "[S]o-
called mixed questions of fact and law, which require the
application of a legal standard to historical-fact
determination" are not "facts" and thus not subject to the
presumption of correctness. *Id.* We think this case falls within
this category.

Our inquiry must look first into the professional
performance of defense attorney Ortiz-Rodríguez to
determine whether it fell below an objective standard of

reasonableness. This determination undoubtedly presents a "mixed question of law and fact." Second, we must conduct a similar analysis of the circumstances surrounding the prosecutor's actions and omissions during the case, and whether his conduct affected petitioner's due process rights.

**Ineffective Assistance of Counsel**

One of the arguments at the core of Cruz-Berrios' habeas petition is that his attorney's lackluster performances at different stages of the proceedings truncated his federal constitutional right to effective assistance of counsel. Specifically, Cruz-Berrios alleges that his counsel failed him at both the trial court and appellate proceedings in the following manner: (1) failing to impeach Agent Vega with evidence that contradicted his trial testimony; (2) failing to steer the trial court away from error when it relied on Vega's statements to conclude that the victim had identified Cruz-Berrios as the assailant; and (3) submitting an incomplete trial record during the appeal. *See* Docket No. 180 at pgs. 21-26.

A defendant challenging the effectiveness of counsel must follow the two-prong test laid out in *Strickland v. Washington*, 466 U.S. 668 (1984). To meet *Strickland's* two-prong test, Cruz-Berrios must show that: (1) counsel's performance was "deficient" which means that it "fell below an objective standard of reasonableness;" and (2) that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88; *Argencourt v. United States,* 78 F. 3d 14, 16 (1st Cir. 1996). Counsel's mishaps must have been "so serious as to deprive the defendant of a fair trial." *Strickland,* 466 U.S. at 687. Petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Smullen v. United States,* 94 F.3d 20,23 (1st Cir. 1996) (quoting *Strickland,* 466 U.S. at 689).

### (i)    Failure to impeach Vega

Agent Vega had provided inconsistent statements at the suppression hearing, at sworn statements and reports, i.e. Sanchez' report. During the criminal trial, agent Vega testified that a day after the incident, he interviewed the victims and Ortiz-Burgos identified Cruz-Berrios as the perpetrator. That statement is incompatible with agent Sánchez' report.

Ortiz-Rodríguez had the foundation to impeach agent Vega during cross-examination but failed to do so. Because the eyewitness identification was the only piece of evidence that the prosecution had to convict Cruz-Berrios, impeaching Vega with the inconsistencies in his testimony would have created reasonable doubt in the factfinder's mind.

Although failure to impeach "does not, standing alone, amount to ineffective assistance," *Jenkins v. Bergeron*, 67

F.Supp.3d 472, 479 (2014), agent Vega was a key witness and his testimony about the identification carried the weight in convicting Cruz-Berrios. Given these circumstances, the Court cannot fathom a reasonable explanation for counsel's failure to confront him with material inconsistencies in his testimony.

As to the second prong, we conclude that there is a reasonable probability that Cruz-Berrios' guilty verdict would have been different but for counsel's error. As case agent, and as the one who recorded Ortiz-Burgos' first identification, (or lack thereof), of the perpetrator, agent Vega was a key witness for the prosecution. It is reasonable to conclude that his impeachment could have led to a different outcome in the trial.

### (ii)    Failure to correct trial court

To make matters worse, Cruz-Berrios argues, attorney Ortiz-Rodríguez did not correct or clarify some statements that the Court of First Instance Judge made when he announced his verdict. Cruz-Berrios cites a portion of the transcript where the Judge explains that he gave full credibility to Ortiz-Rodríguez' eyewitness identification because the victim knew Cruz-Berrios and "identified [him] 'so fast.'" Docket No. 180, citing Docket No. 58-1 at pgs. 61-62.

Cruz-Berrios avers that his attorney should have corrected the trial court's impression that Ortiz-Burgos identified him so expeditiously when it wasn't until two days after the incident (on August 28th) that the victim first signaled him as the culprit.

Cruz-Berrios has not satisfied *Strickland's* two-part test. Regarding performance, Ortiz Rodríguez' inaction does not "fall below an objective standard of reasonableness" as required under the first prong. The court's characterization of the eyewitness identification as "fast" would most likely not be altered simply because one additional day went by.

As to prejudice, Cruz-Berrios has not shown that but for counsel's deficient performance at this stage, there is a reasonable probability that he would not have been found guilty. Here, the Judge had already made his decision and was reading his findings when he referred to the speediness of the identification. Correcting the Court during the reading of the verdict would not have changed the outcome.[20]

---

[20] Although we don't find that Ortiz-Rodríguez was inefficient in failing to object the "speediness" determination, the Judge's expressions confirms that his decision was based on Vega's testimony and on the eyewitness identification.

### (iii)    Ineffective Assistance during Appeal

Cruz-Berrios alleges that Ortiz-Rodríguez' poor strategic choices continued throughout the appellate proceedings. According to Cruz-Berrios, his attorney stipulated a narrative summary of the evidence to present to the Court of Appeals when he should have instead reproduced the entire record. Most notably, Ortiz-Rodríguez did not include the transcript, or a summary, of the suppression hearing at the state court. Cruz-Berrios argues that the omission left the appellate court with an insufficient basis for review.

Rule 29 of the Puerto Rico Court of Appeals provides that parties may choose to stipulate a narrative of the evidence in lieu of the entire record, thereby undermining the argument that failing to reproduce the entire record *de facto* constitutes ineffective assistance of counsel. The decision to submit a narrative rather than the entire record has a sound basis: to expedite the appeals process. In fact, Rule 76 of the Puerto Rico Court of Appeals requires a party that wants to submit the entire record to include a motion explaining the reasons for such decision and explaining why making the entire record available is "indispensable" and "advances" the proceedings.

Lastly, although Ortiz-Rodríguez did not include the transcript of the suppression hearing, his appeal raised the issue that was at the heart of the motion to suppress: the challenge to the eyewitness identification. Therefore, the PRCA was privy to the procedural history of the case as well as to the key aspects of Cruz-Berrios' claims of innocence.

Hence, we do not believe that Cruz-Berrios rebutted the "strong presumption" that counsel's conduct was reasonable regarding the omission of the transcript of the suppression. *See Smullen*, 94 F.3d at 23.[21]

---

[21] Aside from those instances that Cruz-Berrios raised in his pleadings, and are discussed in this R&R, Ortiz-Rodríguez made other questionable decisions that are worth noting. The first, and the one that perhaps had the most impact in the outcome of the case, is the decision to waive the right to a jury trial. After the PRCA's resolution overturning the suppression of the eyewitness identification on the grounds that the issue was one for the jury, not the judge, to decide, it seems appalling that defendant chose to have a bench trial. At the habeas hearing, Ortiz Rodríguez said that Cruz-Berrios made that choice "because he knew the Judge." Although we do not have the benefit of Cruz-Berrios' explanation, the reason proffered seems trivial particularly in light of the PRCA's mandate to bring the issue "to a jury." Furthermore, it appears from the record that Ortiz-Burgos stipulated Cruz-Berrios' criminal history category even though it exposed his client to life imprisonment due to the "three strikes rule." Ortiz-Rodríguez expressed at the hearing that he "had to do so" because the prosecution would not have allowed otherwise. Whether that characterization is true or not, we believe that the role of a defense attorney is to adamantly protect his client's rights, even if that means defending an issue that the government will not easily concede. It

**Prosecutorial Misconduct**

Petitioner's last point is that the Commonwealth of Puerto Rico violated his due process rights by knowingly presenting false evidence to the trial court; eliciting perjured testimony; and withholding exculpatory evidence. Docket No. 180 at pg. 8.

The leading case on the issue of prosecutorial misconduct and whether it constitutes a violation to a criminal defendant's due process rights is *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). *See McCants v. Hallenback*, 13–CV–5587, 2014 WL 4638836, at *6 (E.D.N.Y. Sept. 16, 2014) (Bianco, J.). As held by the Supreme Court, the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by knowingly using false evidence. *Mooney v. Holohan*, 294 U.S. 103 (1935).

Under *Mooney*, a defendant's due process rights are violated when the state obtains a conviction through a

---

appears that Ortiz-Rodríguez defaulted in that duty. Lastly, although in passing, Ortiz-Rodríguez mentioned that the victim, Ortiz-Burgos, approached him at some point and expressed that he did not want to continue on with the case. Rather than bring the matter before the Judge, Ortiz-Rodríguez told him to "go to the prosecutor." Again, although not rising to the level of ineffective assistance of counsel by itself, under *Strickland*, we are convinced that Ortiz-Rodríguez did not zealously defend his client's rights.

deliberate deception of both the court and the jury through the presentation of testimony known to be perjured. *Mooney*, 294 U.S. at 112. A defendants' due process rights are also violated when the state, although not soliciting false evidence, allows it to go uncorrected when it appears. *Napue*, 360 U.S. at 269.

The First Circuit has established criteria to evaluate a defendant's allegations of prosecutorial misconduct: (1) the severity of the conduct and whether it was isolated and/or deliberate; (2) context in which the conduct occurred; (3) whether the trial court gave a strong and explicit cautionary instruction; (4) whether any prejudice surviving the court's instruction likely could have affected the outcome of the case; (5) the strength of the evidence against defendant. *United States v. Auch*, 187 F.3d 125, 129 (1st Cir. 1999)(citations omitted); *United States v. Manning*, 23 F.3d 570, 574 (1st Cir. 1994).

Although the factors related to jury instructions are not applicable here because Cruz-Berrios waived his right to a trial by jury, we believe that the other factors weigh in favor of a finding of misconduct.

Sánchez-Rodríguez' conduct throughout Cruz-Berrios' case was tainted with unfairness. During the habeas hearing, Oliveras expressed that when he led the OIG investigation, he

found that there had been inconsistencies and serious issues in the handling of the case. Even though he did not ultimately recommend disciplinary actions against Sánchez-Rodríguez, we give weight to his testimony regarding his findings against the prosecutor.

The state court also recognized that Sánchez-Rodríguez had behaved improperly when it pointed out that: (1) he failed to disclose that Ortiz-Burgos had doubts regarding the identity of the perpetrator; and (2) he **knew** that Ortiz-Burgos was "lying" at trial when Ortiz-Burgos testified that he never told attorney Torres-Ortiz about his doubts regarding the identity of the home invasion's culprit. *See* Docket No. 56-8 at pg. 39, 46 (emphasis added). At the habeas hearing, Sánchez-Rodríguez casually stated that "victims recant all the time" and that it is not a compelling reason to change the course of a case.

In that sense, the prosecutor's use of Ortiz-Burgos' testimony as the cornerstone of the case knowing that he had doubts regarding his identification satisfies the first two elements of the *Mooney-Napue* line of cases. *See United States v. Bagley*, 473 U.S. 667, 679-80 (citing *United States v. Agurs*, 427 U.S. 97, 104 (1985) (1st Cir. 1985)(recognizing that the "knowing use of perjured testimony involves prosecutorial

misconduct and, more importantly, involves 'a corruption of the truth-seeking function of the trial process.'").

Cruz-Berrios also condemns the prosecutor for knowingly using agent Vega's false testimony at trial. At the evidentiary hearing, Vega admitted that he misrepresented several key facts at the trial, particularly that he was not the first officer to interview the victims, and that on the first interview, none of the victims identified Cruz-Berrios as the assailant.

The pervasiveness of Sánchez-Rodríguez's conduct became evident during the habeas hearing when he made several startling statements. First, he stated that at some point the victim told him that he wasn't sure whether he wanted to continue with the case. Sánchez-Rodríguez responded that it was not up to the victim and continued to prosecute the criminal action without informing the Court of Ortiz-Burgos' doubts. Also, when asked about the exculpatory evidence detailed in the OIG's report, Sánchez-Rodríguez repeatedly dismissed it.

This leads to the final point. In convicting Cruz-Berrios, the Court relied solely on the eyewitness identification of Ortiz-Burgos. His testimony was not bolstered by corroborating evidence. The other two victims did not identify Cruz-Berrios. No physical evidence was recovered from the scene. The other two assailants were never

identified. The suspicious car with government license plates, which was arguably used as a getaway vehicle, was not found. The only other piece of evidence presented was the testimony of inmate Rivera-Mateo who was allegedly told by Cruz-Berrios that he had committed the crime. The Judge, however, relied mainly on Ortiz-Burgos's eyewitness identification. Therefore, the "strength of the evidence" factor favors Cruz-Berrios. *See United States v. Casas*, 425 F.3d 23, 54 (1st Cir. 2005).

Given the factual background, we can safely conclude that the prosecutor's tactics affected the outcome of the trial.  In his judgment, the Judge who presided at Cruz-Berrios' trial wrote that the testimonies were "not clear" and "not pure" and that there had been "large contradictions." *See* Docket No. 58-1 at pgs. 60-62. Despite those red flags, the Judge gave great weight to the eyewitness identification because Ortiz-Burgos "knew the defendant" and identified him "fast." He also gave some consideration to the testimony of Rivera-Mateo because "he had no way of knowing about the facts of the case" unless Cruz-Berrios had told him. However, the Judge specifically stated that the "essential" factor in his decision was the testimony of Ortiz-Burgos. Docket No. 58-1 at pgs. 64-65.

In view of these circumstances, we conclude that the prosecutor's conduct so "poisoned the well" that it rendered the trial unfair. *See United States v. Ayala-Garcia*, 574 F.3d 5, 8 (1st Cir. 2009).

**IV.    Conclusion**

After careful consideration, and for the reasons stated forth herein, I recommend that the Presiding Judge grant petitioner's request for habeas relief under 28 U.S.C. § 2254(d), and deny respondents' Motion for Summary Judgment at Docket No. 139.

IT IS SO RECOMMENDED.

The parties have fourteen days to file any objections to this report and recommendation. Failure to file the same within the specified time waives the right to appeal this report and recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143,150-51 (1st Cir. 1994); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 19th day of August, 2019.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE